**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5879-17T2

MANUFACTURERS AND
TRADERS TRUST COMPANY,
as Indenture Trustee,

      Plaintiff-Respondent,

v.

MARINA BAY TOWERS URBAN
RENEWAL II, LP, MARINA BAY
TOWERS URBAN RENEWAL, LP,
BEACH CREEK MARINA, INC.,[1]
ESSEX COUNTY IMPROVEMENT
AUTHORITY, CITY OF NORTH
WILDWOOD, CONSULT URBAN
RENEWAL DEVELOPMENT
CORPORATION, BARBARA
WATERMAN, ALICE WALSH,
FRANCES DAVIS, LOUISE
JARAMILLO, CAROLYN NARCISO,[2]

---

[1] Beach Creek Marina, Inc. is incorrectly identified as Beach Creek Marina, LLC in the caption of the foreclosure complaint.

[2] This defendant was identified as "Carolyn Narciso" in the foreclosure complaint but "Carol Narciso" in the receivership action. Her attorneys, South Jersey Legal Services, identify her as "Carol" in the attachment to their Case Information Statement.

JEAN HOPPER, JOSEPH MORELLO, EDWARD & RAMONA HELLER, DOROTHY J. KIRWIN, PAUL & JOAN NEWELL, BONNIE MCNAMARA, and PHYLLIS HANAHAN,

      Defendants-Respondents,

and

STATE OF NEW JERSEY DEPARTMENT OF COMMUNITY AFFAIRS, NEW JERSEY HOUSING AND MORTGAGE FINANCE AGENCY, and STATE OF NEW JERSEY,

      Defendants-Appellants,

and

MARINA BAY TOWERS CONDOMINIUM ASSOCIATION, INC., US BANK – CUST PRO CAPITAL I, LLC, US BANK CUST FOR TOWER DBW, QUALITY ROOFING SUPPLY CO. INC., THYSSENKRUPP ELEVATOR AMERICAS, MULTI ROOF MAINTENANCE LLC, ALEXANDER DANNIBALE, MARGARET KERNS, MARGARET PASSIO, JOSEPH MARLEY, MARY C. TIETZ, JAMES LAWLESS, JAMES GETSINGER, ALICE LONG, ANTOINETTE NUGENT, JOAN M. SHEFSKI, MARY E. SMITH, LOUIS WOJTIW, JOAN CHESAITIS, ANTHONY BOYLE, MALCOLM FERENTZ, JAMES & LINDA MCGRATH, JACQUELINE

2

HUGES, SANDRA WHITENER,
NADALINE PEACOCK, LILLIAN
CAPONE, MARGARET MULDREW,
ELIZABETH JOVOVICH, JAMES
HUNDZYNSKI, MARIANNE
BATCHELOR, BERNITA HOLT,
JOSEPH F. RADOSLOVICH, MARIE T.
BRADY, CLARA MORRIS, DOLORES
MCCOACH, LINDA ANSELL,
FRANCIS MCCLAIN, HELEN
ANDREWS, MICHAEL NORESKI,
SYLVIA ARMSTRONG, PATRICIA
DEVINE, EILEEN O'DONNELL,
JOSEPH PERKIS, MADELINE A.
HOGAN, RONALD KURTZ,
GERALDINE PAXTON, RICHARD &
IRENE MCALLISTER, MICHELLE
COYLE, PATRICIA M. ALLEN,
DOMINIC RAFFAELE, JOSEPH
MADDEN, JAMES HERON, PATRICIA
TRIMBLE, SARA A. KANE, HELEN
UHLEIN, JOAN STAUB, WILLIAM H.
SMITH, ELSIE SMITH, VIRGINIA
GIVIN, ELAINE COHEN, ALICIA &
GUY STEVENS, HELEN &
FREDERICK BEAVER, RICHARD
SINCLAIR, BARBARA SMITH, ANN
HARRIS, IRENE D. STARAHS,
BARBARA MARTINELLI, GERTRUDE
SNYDER, SALLY T. SMITH, MARIE
GRAY, and WALTER CRAWFORD,

    Defendants.

_____

BONNIE MCNAMARA, ALICE WALSH,
BARBARA WATERMAN, CAROL

NARCISO, FRANCES DAVIS, PHYLLIS
HANAHAN, EDWARD HELLER, JEAN
HOPPER, DOROTHY KIRWIN, and JOAN
NEWELL,

      Plaintiffs-Respondents,

and

EILEEN O'DONNELL, NADALINE
PEACOCK, JOAN SHEFSKI, ALICE LONG,
BARBARA SMITH, PATRICIA
TRIMBLE, and SANDRA WHITENER,

      Plaintiffs,

v.

MARINA BAY TOWERS URBAN
RENEWAL II, LP, BEACH CREEK
MARINA, INC., RUBICON DEVELOPMENT,
LLC, RUBICON PROPERTIES, LLC,
CONSULT URBAN RENEWAL
DEVELOPMENT CORPORATION, PAC
CAPITAL, LLC, PAUL COCOZIELLO,
and ESSEX COUNTY IMPROVEMENT
AUTHORITY,

      Defendants-Respondents,

and

NEW JERSEY DEPARTMENT OF
COMMUNITY AFFAIRS,

      Defendant-Appellant,

and

MARINA BAY TOWERS
CONDOMINIUM ASSOCIATION, INC.,
JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, M & T BANK, T.D. BANK,
N.A., US BANK-CUST PRO CAPITAL I, LLC,
and US BANK-CUST FOR TOWER DBW,

     Defendants.

_____

Argued October 2, 2019 - Decided October 22, 2019

Before Judges Sabatino, Sumners and Natali.

On appeal from an interlocutory order of the Superior Court of New Jersey, Chancery Division, Cape May County, Docket Nos. F-049229-14 and L-0365-14.

Susan Marie Scott, Deputy Attorney General, argued the cause for appellants (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Susan Marie Scott, on the brief).

James N. Lawlor argued the cause for respondent Manufacturers and Traders Trust Company (Wollmuth Maher & Deutsch LLP, attorneys; James N. Lawlor and Olivia J. Italiano, on the brief).

Salvatore Perillo argued the cause for respondent PAC Capital, LLC, (Nehmad Perillo Davis & Goldstein, PC, attorneys, join in the brief of respondent Manufacturers and Traders Trust Company).

Keith A. Bonchi argued the cause for respondents Marina Bay Towers Urban Renewal II, LP and Marina

A-5879-17T2

Bay Towers, LP (Goldenberg, Mackler, Sayegh, Mintz, Pfeffer, Bonchi & Gill and Thomas George Aljian, attorneys; Keith A. Bonchi, of counsel and on the brief; Elliott J. Almanza, on the brief).

Robert A. Fagella argued the cause for respondent Beach Creek Marina, Inc. (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, attorneys; Flavio L. Komuves, on the brief).

Michael D. Mezzacca argued the cause for respondents Consult Urban Renewal Development Corporation, Paul Cocoziello, Rubicon Development, LLC, and Rubicon Properties, LLC (Bourne, Noll & Kenyon, PC, attorneys; Michael D. Mezzacca, on the brief).

Robert Beckelman argued the cause for respondent City of North Wildwood (Wilentz Goldman & Spitzer, PA, attorneys; Robert Beckelman, on the brief).

Olga D. Pomar argued the cause for respondents Jean Hopper, Phyllis Hanahan, Joan Newell, Edward Heller, Louise Jaramillo, Bonnie McNamara, Joseph Morello, Alice M. Walsh, Dorothy Kirwin, Carol Narciso, Barbara Waterman and Frances Davis (South Jersey Legal Services, Inc., attorneys; Olga D. Pomar, on the brief).

PER CURIAM

This appeal by the State of New Jersey and two of its agencies involves an income-restricted senior citizen housing project, Marina Bay Towers, that was built in the City of North Wildwood with the assistance of several sources of governmental funding. The project was conceived by developer Paul

Cocoziello, who owns several of the entities involved in the project. Those entities include the owner and lessor of the land where the project was built, Beach Creek Marina, Inc. ("Beach Creek"); the construction manager, Consult Urban Renewal Development Corporation ("CURDC"); and Rubicon Development, LLC, and Rubicon Properties, LLC, companies involved in developing and managing the property. Cocoziello is also the president, executive officer and managing member of PAC Capital, LLC ("PAC Capital"), the company that purchased $7.4 million in bonds issued by the Essex County Improvement authority ("ECIA") to help finance the project. In addition, he is the authorized agent and representative of plaintiff Marina Bay Towers Urban Renewal II, LP ("MBT II"), the limited partnership that currently owns the building.

Specifically, this appeal is from an interlocutory order of the Chancery Division approving a plan to restructure and rehabilitate Marina Bay Towers (the "Restructuring Plan" or "Plan") pursuant to foreclosure litigation, and denying the appointment of a receiver. The foreclosure and receivership actions were not consolidated but were heard together in the Chancery Division.

As we will discuss more extensively in Part I of this opinion, plaintiff Manufacturers and Traders Trust Company ("MTTC"), acting as trustee for PAC

7 <span>A-5879-17T2</span>

Capital, filed the foreclosure action in connection with $7.4 million in bonds that had been issued in 2005 by the ECIA, to refinance the Marina Bay Towers project. The bonds were all purchased by PAC Capital. The foreclosure action was filed in November 2014, approximately three months after certain tenants (the "Litigating Tenants") filed the receivership petition.

The housing project has required significant repairs due, in large part, to extensive damage sustained during Hurricane Floyd and, thereafter, Superstorm Sandy.

Construction of Marina Bay Towers was initially financed through an allocation of federal Low Income Housing Tax Credits ("LIHTCs"), awarded in 1997 by the New Jersey Housing and Mortgage Finance Agency ("HMFA"). The project was also financed by a loan from the New Jersey Department of Community Affairs ("DCA"), also awarded in 1997, through its Neighborhood Preservation Balanced Housing Program (the "Balanced Housing Program"). In connection with the financing provided by the HMFA and the DCA, the State imposed certain occupancy and rent restrictions, also referred to in this opinion as "affordability controls," on the property.

The trial court conditionally approved the proposed Restructuring Plan, subject to oversight by a Special Master. As contemplated by the Plan, the court

extinguished the HMFA and DCA rent and occupancy restrictions. The court

based its decision on a federal statute, 26 U.S.C. § 42(h)(6)(E)(i)(I), as well as

its equitable powers under N.J.S.A. 40:37A-116, a provision affecting

foreclosure actions set forth in the County Improvement Authorities Law,

N.J.S.A. 40:37A-44 to -135 ("CIAL").

On appeal, the HMFA and the DCA (collectively, "the State") principally

argue that the trial court erred by extinguishing the rent and occupancy

restrictions and refusing to appoint a receiver. The participating respondents,

the City of North Wildwood and the Litigating Tenants, largely support the

State's arguments, although they have not filed cross appeals.

For the reasons that follow, we conclude the trial court correctly

determined that, under 26 U.S.C. § 42(h)(6)(E)(i)(I), the rent and occupancy

restrictions imposed by the HMFA in connection with the award of LIHTCs are

extinguished upon a final judgment of foreclosure. However, the trial court

incorrectly ruled that the DCA rent and occupancy restrictions are automatically

terminated by foreclosure under the federal statute and by the rules governing

the Balanced Housing Program. Despite that particular error, the trial court

nonetheless properly exercised its equitable powers and discretion under the

CIAL, N.J.S.A. 40:37A-116, to nullify the DCA provisions containing the

affordable housing restrictions and replace them with revised restrictions for low-income and moderate-income residents that are set forth in the Restructuring Plan. The trial court reasonably found that the revised restrictions were justified to save the economic viability of the project.

We further hold the trial court reasonably exercised its discretion in denying the receivership application, given, among other things, the condition of the building, the fact that more than half of the units are unoccupied, and the lack of funding to accomplish the necessary repairs.

Certain aspects of the trial court's findings in approving the Restructuring Plan do require supplementation. In particular, the court did not determine whether the proposed successor developer was a "qualified housing sponsor," under N.J.S.A. 40:37A-107(j), and whether the obligations under the ECIA lien could be met if the project was required to satisfy the definition of a "qualified residential rental project" under 26 U.S.C. § 142(d)(1). Consequently, on remand, the trial court shall make these required additional findings and modify its approval of the Restructuring Plan, as may be appropriate. Also, the wording of the new deed restriction approved by the trial court appears to conflict with the occupancy and rent restrictions in the Restructuring Plan. The trial court must resolve on remand that apparent conflict in the deed restriction.

10

In all other respects, the trial court's decision is affirmed.

I.

As the trial court aptly stated at the outset of its extensive written opinion, this case is one of "novelty and complexity, involving fourteen days of abstruse financial detail and literally dozens of motions, conferences and meetings with the parties over more than two years[.]"

Our following recitation of the facts and procedural history delves into the aspects of the project germane to the issues raised on appeal by the State, particularly the affordability restrictions.

The LIHTCs

A critical component of the initial financing of this development was the award of LIHTCs.[3] In July 1997, the HMFA notified the project's developer, then known as Marina Bay Towers Urban Renewal, LP ("MBT"),[4] that its application for LIHTCs had been approved for an annual amount of credits not

---

[3] We discuss the legal and financial aspects of the LIHTCs in more detail, infra, in Part II.

[4] The notification was actually sent to a predecessor entity, St. Anne's Urban Renewal, LP ("St. Anne's"). St. Anne's was the original developer for the project but was reorganized and renamed Marina Bay Towers Urban Renewal, L.P. in the mid-1990's. For simplicity, we will refer to both entities as MBT.

to exceed $1,409,070.  Because the credits were available over a ten-year period, the total allocation was $14.1 million.[5]  MBT raised $11.1 million to finance the project through the sale of these tax credits to a limited partner.

The DCA Balanced Housing Program Funds

In September 1997, the DCA notified the City that its application for funds from the Balanced Housing Program for this project had been approved in the amount of $1,478,400.[6]  The DCA and the City accordingly executed a Grant/Loan Agreement (the "Grant Agreement") on November 21, 1997.  The stated purpose of that DCA award was to "provide funds to construct 142 one-bedroom apartments for rent to low income senior citizens to be known as . . . Marina Bay Towers."  Although termed a "grant," the award had certain factors of a mortgage loan, as we will describe.

---

[5]  See generally this court's previous unpublished opinion in Royal Tax Lien Servs., LLC d/b/a/ Crusader Lien Servs., LLC v. Marina Bay Towers Urban Renewal II, LP ("Royal Tax Lien"), No A-1638-13 (App. Div. Aug. 14, 2015) (slip op. at 6).

[6]  At the time, the Balanced Housing Program rules provided that applications could be accepted only from municipal governments, and that funds were to be allocated to municipalities on behalf of specific projects.  24 N.J.R. 1385(a), 1389, 1391 (April 6, 1992).  The rule was amended in 2006 to also allow applications from non-profit organizations and for-profit organizations as long as the proposed project met certain criteria. 38 N.J.R. 3711(a), 3716 (Sept. 18, 2006); N.J.A.C. 5:43-1.3.

A-5879-17T2

The Grant Agreement required the City to enter into a contract with MBT "to provide up to $1,478,400 of Balanced Housing Funds for developing the project." The Agreement required the parties to include terms that: (1) MBT agreed to create 142 new, 725 square foot, one-bedroom, affordable housing units renting for $375 per month; (2) MBT would "execute a note in the amount of $1,478,400 and mortgage in favor of the [DCA];" (3) MBT would "comply with the terms and conditions set forth in [the Grant] Agreement;" (4) MBT would "enter into an Affordable Housing Agreement, Declaration of Covenants, Conditions and Restrictions with [DCA's] Affordable Housing Management Service;" and (5) MBT would execute an Affordable Housing Management Service Agreement ("AHMSA").

The Grant Agreement further stipulated that "[a]ny unit funded under this Agreement shall be subject to affordability controls as specified in the N.J.A.C. 5:14 Chapter 4 et. seq." It stated that "[i]n addition to any other laws, rules and regulations which may be applicable to the performance of this Agreement, the Grantee shall be governed by the provisions of the Fair Housing Act of 1985 (N.J.S.A. 52:27D-301 et seq.) [the "FHA"] and the . . . Balanced Housing

Program Rules (N.J.A.C. 5:14)."[7]  The Grant Agreement also required the City to provide a thirty-year tax abatement for the project.

In furtherance of the Grant Agreement, MBT, along with CURDC and, on the other hand, the City, executed in October 1997 a "Third Party Agreement." The agreement included all of the terms required by the Grant Agreement except the provision requiring MBT to execute the "Affordable Housing Agreement, Declaration of Covenants, Conditions and Restrictions"

In October 1998, MBT executed a Mortgage Note for $1,478,400 in favor of DCA's Balanced Housing Program (the "DCA Note").  The DCA Note stated that "[t]he proceeds of the loan shall be used to fund a portion of the development costs incurred in the (construction/rehabilitation) of a 142 unit (senior) rental project that will be occupied by duly qualified low and moderate income senior households in accordance with the [FHA]."  No interest was due on the note until construction was completed, after which point simple interest accrued at two percent per annum.  The principal amount, plus accrued interest, was due and payable, at the option of the DCA, thirty years after the project received a final certificate of occupancy.

---

[7]  The Balanced Housing Program rules were recodified in July 1998 as N.J.A.C. 5:43.  See 30 N.J.R. 2644(a) (July 20, 1998).

A mortgage securing the DCA Note (the "DCA Mortgage") was executed the same day as the DCA Note.  The DCA Mortgage recited that MBT

> covenants and agrees to <u>comply with the Balanced Housing Program and any rules or regulations promulgated pursuant thereto</u> and with any amendments or supplements of these rules or regulations as the same exist as of the date hereof, <u>including but not limited to the Affordability Controls requiring that the units rehabilitated or constructed with the mortgage proceeds remain affordable to low and moderate income families</u>.  The Borrower further covenants and agrees to comply with all requirements imposed upon it by the Grant Agreement or any agreement with the Lender reflecting said Agreement. If any provision of this Mortgage shall be determined to be inconsistent with the Balanced Housing Program, its rules or regulations or the Grant Agreement, all of the latter shall govern.
>
> [(Emphasis added).]

In that same vein, the DCA Mortgage required "the Project [to] be used solely to provide residential housing for persons identified in [MBT's] application for funding."[8]  In addition, the mortgage stated that the "Mortgage

---

[8]  Presumably, MBT's application for funding, which has not been provided in the record on appeal, identified the prospective tenants as low-income senior citizens.  Several of the DCA documents do not specifically describe the DCA affordability controls and instead, refer to both low and moderate-income households or omit any reference to senior citizens.  Plaintiffs have not disputed that the DCA affordability controls imposed by the various documents executed in connection with the Balanced Housing Program funding required the units to be rented to low-income senior citizens.

Loan provided for herein shall be subject to statutory and regulatory restrictions contained in the [FHA] and accompanying regulations, and in connection therewith the Lender shall have the powers set forth in the Act, and the Borrower hereby consents to such restrictions and powers and agrees to be bound thereby." (Emphasis added).

On December 23, 1998, MBT executed the AHMSA, agreeing to certify households for all units in the project using the applicable federal income guidelines. The project was described in the AHMSA as 142 low-income units.

Construction of the Project and Various Setbacks

Construction of the project began in late 1998. After significant delays, a temporary certificate of occupancy was issued for sixteen of the residential units in December 2000. The project was deemed "placed in service" for tax credit purposes. A final certificate of occupancy issued in December 2001. The delays caused significant financial setbacks, such that the project's original financing plan was no longer viable.

On December 1, 2002, MBT executed a mortgage in favor of CURDC (the "CURDC Mortgage"), securing a promissory note in the amount of $1,567,163. That mortgage was "subject and subordinate to all existing and future easements, deed restrictions, [and] covenants running with the land . . . relating to the

Mortgaged Premises and to its purposes as low income senior citizen housing, including, without limitation, those deed restrictions imposed by the [HMFA]." (Emphasis added).

In December 2002, MBT and Beach Creek executed a Deed of Easement and Restrictive Covenant for Extended Low-Income Occupancy in favor of the HMFA (the "HMFA Deed"). The HMFA Deed required 100% of the rental units at Marina Bay Towers to remain "rent restricted and occupied by individuals whose income is 50% or less of area median gross income (AMGI)" for forty-five years, unless the restrictions were terminated by foreclosure pursuant to the provisions of the Internal Revenue Code ("IRC" or "Code").

According to Debra Urban, Senior Director of Programs for the HMFA, the HMFA was informed in 2004 "that as a result of various natural disasters and defects in the construction of Marina Bay Towers, approximately $14,000,000 in cost overruns/rehabilitation expenditures had been made to the facility." Consequently, a second round of financing was conceived by MBT II, the successor entity to MBT.

<u>The ECIA Bonds that Refinanced the Project</u>

In May 2005, the City adopted Ordinance 1474 designating the ECIA as the redevelopment entity for the project. Three days later, the ECIA adopted a

resolution authorizing the sale of $7.4 million in Multifamily Housing Revenue Bonds (the "ECIA Bonds") to help refinance the project.[9]

In July 2005, the City adopted a resolution consenting to the assignment of its Third Party Agreement and a 2002 PILOT Agreement[10] with MBT to MBT II. In August 2005, MBT and MBT II executed the assignment. MBT II also assumed the CURDC Mortgage, and the mortgage was modified to add a provision stating that it was subordinate only to the mortgage securing the ECIA Bonds.

Meanwhile, in August 2005, the ECIA executed an indenture agreement (the "Indenture") with JPMorgan Chase Bank, National Association ("JPMorgan"), as trustee, for $2.8 million in Series A and $4.6 million in Series B Multifamily Housing Revenue Bonds. Pursuant to a loan agreement of the same date (the "ECIA Loan Agreement"), the ECIA agreed to loan the proceeds of the bonds to MBT II (the "ECIA Loan"). Under the ECIA Loan Agreement, MBT II agreed to operate the project as a "qualified residential rental project"

---

[9] The Cape May County Board of Chosen Freeholders authorized the ECIA to issue the bonds because Cape May County did not have a county improvement authority.

[10] PILOT is an acronym for payment in lieu of taxes. The City entered into this agreement pursuant to the Long Term Tax Exemption Law, N.J.S.A. 40A:20-1 to –22.

as defined in Section 142(d) of the IRC, 26 U.S.C. § 142(d).

PAC Capital purchased the bonds in August 2005. The proceeds were loaned to MBT II, which executed promissory notes for the Series A and B bonds. The loan and promissory notes were secured by a Mortgage and Security Agreement (the "ECIA Mortgage") entered into by MBT II and the Marina Bay Towers Condominium Association, Inc., as mortgagors, and JPMorgan as mortgagee.

With respect to the affordability limitations, the ECIA Mortgage contained the following provisions regarding "Restrictions on the Property:"

> (a)    The parties acknowledge and agree that the mortgage granted by this Mortgage is subject and subordinate to all existing and future easements, deed restrictions, covenants running with the land and rights of way relating to the Property and to its purposes as low income senior citizen housing, including, without limitation, those deed restrictions imposed by the [HMFA Deed].[11]    The foregoing easements, deed restrictions, covenants running with the land and rights of way shall be deemed Permitted Encumbrances for purposes of the Loan Documents.[12]
>
> (b) Notwithstanding anything to the contrary contained in the Loan Documents, Mortgagee agrees that the lien

---

[11]    The ECIA Mortgage referred to the HMFA Deed as the Regulatory Agreement.

[12]  The "Loan Documents" included the Indenture, promissory notes, ECIA Loan Agreement, and ECIA Mortgage.

> created by this Mortgage shall be subject to the provisions of the [HMFA Deed] and that certain New Jersey Department of Community Affairs, Division of Housing and Community Resources, Housing Affordability Service Deed of Easement and Restrictive Covenant for Extended Low and Moderate Income Occupancy dated July 15, 2005.
>
> [(Emphasis added).]

A corresponding deed (the "DCA Deed") also was issued, as well as a related Affordable Housing Agreement ("AHA") between the DCA and MBT II.

The intent of the DCA Deed was "to bind the owner of the described premises and notify all future purchasers . . . that the housing unit [was] encumbered with affordability controls as contained in the [AHA]." (Emphasis added). The deed provided that it was "binding on all successors in interest to the Building and Project . . . and shall run with the land until the end of the Affordability Control Period which [was] defined in the [AHA] as a period for at least thirty (30) years beginning January 1, 2002." (Emphasis added).

The AHA recited that "unforeseen hardships [had] necessitated the substantial rehabilitation of the Property after [it] was placed in service for purposes of IRC [Section] 42." Because "[t]he existing financing structure was insufficient to handle the cost of the substantial rehabilitation," MBT II had "provided a long term financing plan to insure the continuing affordability of

20

the housing for income eligible tenants."

The stated objective of the AHA was to "ensure that the affordability controls [were] contained directly in the property deed for the premises . . . so as to bind the owner," and to "ensure that the described housing units . . . remain[ed] affordable to low and moderate income eligible households for that period described in [the agreement]" (Emphasis added). MBT II agreed to "not rent the Affordable Housing unit other than to a Renter who has been certified utilizing the income verification procedures established by [the DCA, HMFA and Council on Affordable Housing] to determine qualified Low and Moderate Income-Eligible Households." Notably, the AHA provided that it "shall not be terminated in the event of a judgment of Foreclosure."

Additional LIHTCs

By securing the ECIA Bond financing, the project became eligible for, and was later awarded in 2005, an additional annual allocation of $665,061 in LIHTCs by the HMFA, which, according to Urban, generated "approximately $6.3 million in equity for MBT II."[13] MBT II and Beach Creek accordingly

---

[13] The additional allocation was for 4% tax credits as opposed to the original allocation of 9% tax credits. Urban explained that the source of the funding determined the type of tax credit awarded. "Nine percent tax credits are typically [associated with] conventional, market-rate financing . . . [w]hereas,

executed an amendment to the HMFA Deed, effective December 30, 2005.[14] The restrictions in the HMFA Deed, which remained in full force and effect, were made applicable to the new allocation of LIHTCs.

Superstorm Sandy Damage

When Superstorm Sandy hit New Jersey in October 2012, Marina Bay Towers suffered significant damage. To assess that damage, MBT II engaged FTI Consulting ("FTI") to review the reports of various experts and the construction drawings to estimate the cost of reconstruction of the damaged portions of the facility. FTI's preliminary estimate issued in June 2013 (the "FTI Report") forecast repair costs exceeding $11 million. MBT II provided the FTI Report to its insurance carrier and the HMFA. The insurance carrier refused to pay the claim in full and MBT II has been litigating that dispute.

Default on the ECIA Bonds

MTTC became the successor trustee under the Indenture, effective April

_____

the projects that receive the benefit of tax exempt bond financing would only be qualified for a four percent tax credit."

[14] Although Urban certified that MBT II was awarded an additional annual allocation of $665,061 in LIHTC, the amendment to the HMFA Deed stated that the project had become eligible for "an estimated annual amount of $656,298" in LIHTC. This minor numerical difference is not material to the issues before us.

14, 2014. In April 2014, MTTC issued a default notice regarding the ECIA Bonds. MTTC declared that all amounts outstanding were "immediately due and payable."

The Tenants' Receivership Action

In August 2014, the Litigating Tenants filed an Order To Show Cause ("OTSC") and a "Petition for Receivership, Verified Complaint for Specific Performance and for Declaratory and Injunctive Relief" in the Chancery Division. Their petition alleged that the building had suffered "habitability problems such as water leaks, improperly sealed windows, and damaged ceilings, walls and floor coverings . . . for years," and that the owner had repeatedly been cited for code violations. The Litigating Tenants sought the appointment of a receiver, pursuant to the Multifamily Housing Preservation and Receivership Act, N.J.S.A. 2A:42-114 to -142 (the "Receivership Act"), as well as certain other relief.

MTTC's Foreclosure Complaint

In November 2014, MTTC filed in the Chancery Division a complaint in foreclosure based on the default in bond payments. The complaint alleged that storm damage to 135 units resulting from Superstorm Sandy had not been repaired, with fifty units remaining uninhabitable. Further, "[m]ajor building

systems including . . . the roof and exterior wall assemblies remain[ed] damaged, and the Borrower ha[d] failed to fund an estimated $11 million of repair and rehabilitation work required to restore the building to its pre-casualty condition." In addition, MTTC claimed that "[a]s a result of extraordinary legal costs resulting from . . . litigation with the City and defaulting limited partners of the MBT II partnership, together with the costs resulting from the Superstorm Sandy property insurance loss claim, MBT II [was] woefully and inadequately capitalized." MTTC alleged that the failure to keep the building in good repair and to remain adequately capitalized were events of default by MBT II. MTTC sought a judgment directing that it be paid the amounts due, that the project be sold to satisfy the bondholders, and that it be granted possession of the premises.

In March 2015, the HMFA wrote to the Internal Revenue Service ("IRS") notifying the IRS that MTTC's foreclosure action "may constitute a 'planned foreclosure' or 'an arrangement . . . a purpose of which is to terminate' the low income housing extended use period" under 26 U.S.C. § 42(h)(6)(E)(i)(I). No action was taken by the United States Treasury Secretary, however, in response to that letter alleging an improper motivation for the foreclosure.

24

<u>Return of the Order to Show Cause</u>

In February 2015 and May 2015, a Chancery Division judge[15] heard oral argument on the Litigating Tenants' receivership application. The judge found the building was eligible for receivership under N.J.S.A. 2A:42-117(b). However, exercising the "discretion which [he was] satisfied the statute affords, [he did] not appoint a receiver yet." The judge entered an order on June 5, 2015, denying the OTSC and requiring MBT II to file with the court "a specific plan of how to address physical building conditions reported to the Court by the Plaintiffs."

Soon thereafter, Vincent Mancini, the architect for Marina Bay Towers, submitted a certification to the court stating that he had reviewed the work done to address the building and fire code violations that had been alleged by the DCA and the City's Bureau of Fire Prevention. Mancini certified that the work was substantially complete. He also certified that there were no conditions "that pose[d] an imminent risk to the health and safety of any of the tenants."

<u>Efforts in the Litigation to Formulate Plans to Revive the Project</u>

At a case management conference in late July 2015, PAC Capital

---

[15] We shall refer to this judge, who was later succeeded on the case when he retired, as the "first Chancery Division judge."

submitted to the court a "long-term plan."[16] The attorney for PAC Capital explained that the plan submitted went beyond what the judge had ordered, and was a "two-phase [plan] which, in the second phase, propose[d] an additional affordable building with 129 affordable units."[17] Because of the "scope of the plan," the parties agreed to give the DCA additional time to review it. A hearing was set for September 2015 before a second Chancery Division judge.[18] A second amended petition for receivership was filed on August 22, 2015. The parties thereafter engaged in mediation, although no global agreement among all parties was achieved.

In February 2016, MTTC moved for summary judgment, requesting an order approving the "financial restructuring capitalization plan." The judge declined summary relief, finding that a plenary hearing would be necessary. He

---

[16] The July 2015 version of the plan has not been provided in the record. The plan that is a subject of this appeal was prepared in the fall of 2015 and was submitted to the trial court in February 2016.

[17] In its brief, MBT II describes the two-phase plan as "Phase I being the existing building . . . with 91 affordable units and Phase II being a new inclusionary development on the northern portion of the property which would provide [an] additional 50 units such that, all totaled, the property would restore the 141 damaged affordable rental units." It is unclear whether MBT II is referring to the same plan submitted to the court in July 2015.

[18] The first Chancery Division judge retired at the end of July 2015.

denied the renewed motion for a receiver.

At a case management conference on July 13, 2016, counsel for the DCA represented to the court that it had an expert preparing a remediation plan. The court consequently scheduled a hearing to hear testimony from witnesses regarding the two plans. [19]

The plenary hearings commenced on October 25, 2016. At the outset of the proceedings, the second Chancery Division judge denied the DCA's last-minute request to postpone the hearing. The judge also denied the Litigating Tenants' application for a receiver "because there's no money to pay a receiver." He explained:

> This is a financially non-viable situation. Receiverships require money. There is not enough money to fix the building and to do anything with a receiver. A receivership can be done in a viable building where the rental income would pay the receiver. In this case, in this situation it's 148-unit complex, there's 50 units or so which are rented because of the unrentability of the rest of the units.
>
> There would be no rental stream for a receiver to be appointed in this case. I don't know what the benefit of it [would be]. I don't think there would be anything. I

---

[19] The DCA plan has not been provided in the record and there was no testimony regarding the plan at the plenary hearings. Cocoziello testified that there was a DCA plan that kept the rent restrictions on all units and did not pay off any existing debt. He asserted the DCA plan unfairly "would wipe out [his] interest with no accountability for it."

think it would be a detriment to the tenants.

The judge noted that plaintiffs were the only ones who had "come forward with a solution," that they had "come up with dozens and dozens of scenarios," and that he was "uncertain as to . . . the sincerity of the State in what the State's intentions [were]." The judge recognized that the State was "certainly . . . not obligated to support anything, to give any more money to anybody else." The judge further commented that "at the end of the day I don't think there's any willingness by the DCA or the HMFA to do a thing to help this building." The judge observed there was a "vital public interest" involved in providing low-income senior housing, and believed that any further delay of the case was "against [the] public policy of the State."

Testimony of Cocoziello and Other Witnesses

The trial court held fourteen intermittent days of proceedings and hearings, spanning from October 2016 to December 2017. During those proceedings, the court heard testimony from several witnesses.

The main witness was Cocoziello, the key individual who spearheaded the building and development of the housing project. We need not detail here all facets of his extensive testimony, which is familiar to the parties, but we will highlight certain portions.

28

Cocoziello traced the purchase of the site by Beach Creek in 1987 to the project's status as of the time of the plenary hearings nearly twenty years later. He testified the project was initially intended to be developed as market-rate housing. That plan was scrapped, however, when the real estate market crashed in the early 1990s. Cocoziello decided to proceed instead with a project to create rental housing for low-income senior citizens.

Cocoziello described the many complicated transactions and financing arrangements that enabled the project to be constructed. Among other things, he discussed the $14.1 million in LIHTCs issued by the HMFA, the $1.47 million in additional financing from the DCA's Balanced Housing Program, and the refinancing plan that resulted in the issuance of the $7.4 million in ECIA bonds.

According to Cocoziello, most of the foundation work for the building was "basically destroyed" in September 1999 by Hurricane Floyd, causing a "huge delay" and cost overruns. Thereafter, problems were encountered with the steel and concrete modules used to construct the building, which "triggered a series of water infiltrations and problems with the building that were . . . horrendous." Litigation with the manufacturer of the modules ensued and was eventually settled. It cost an additional $14 million, or double the budget, to fix

the problems and complete the construction. Approximately $10 million in standby financing was obtained from Ocwen Bank, an affiliate of MBT's limited partner investor, and CURDC loaned $1.6 million to the project to cover the cost overruns.

Cocoziello obtained a private letter ruling from the IRS that the rehabilitation costs could be aggregated as a fictional separate building in order to qualify for additional LIHTCs. Cocoziello then assembled the refinancing plan that resulted in the issuance of the ECIA Bonds and the allocation of the 4% LIHTCs. The proceeds from the ECIA Bonds were used, in part, to pay off the Ocwen debt.

According to Cocoziello, the building was approximately 96% occupied in 2005 and 2006. The occupancy rate dropped in 2007 and 2008 to between 88% and 92%, and dropped further between 2009 and 2012 to approximately 85%. Cocoziello blamed the drop in occupancy on litigation with the City, which had drained resources to upkeep the building, and also the 2007-2008 housing market "melt-down." Occupancy continued to fall after 2012. By the end of 2015, the building was only 50% occupied.

Following Superstorm Sandy, substantial repairs to the building were funded by PAC Capital. The roof had been severely damaged by the storm, and

the units and common areas were infiltrated by water.

Cocoziello explained that the Restructuring Plan[20] submitted to the trial court under Section 116 of the CIAL reduced the number of units in the building from 143 to 132. Two staff units were included in the current 143 units, which would be eliminated under the Plan, so the number of units available for rent would decrease by nine units.

As described by Cocoziello, the Restructuring Plan contained two alternative scenarios. The first ("Scenario A") kept 100% of the units as affordable housing units and was dependent on receiving funds from the insurance litigation or state or federal subsidy funds. Under the alternative scenario ("Scenario B"), ninety-one units would remain low- and moderate-income senior housing rental units, while forty-one units would become market-rate, age-restricted units. The market-rate units would be for sale rather than for rent. The affordability restrictions for the ninety-one units under Scenario B would be protected "[p]ursuant to a covenant that would be recorded against the title of the property."

Cocoziello believed that the Restructuring Plan would result in the ability to secure financing of the $11 million in additional funds needed to rehabilitate

---

[20] The State refers to this plan as the "Market Rate Plan."

the building. Under both scenarios, there would be no change to the rent structure for the existing tenants. However, occupancy and rent for new tenants in the rent-restricted units going forward would be based on a formula of 80% of area median income ("AMI").[21] The Plan would move the exercise room, which would be enlarged and modernized, from the seventh floor to a new eighth floor that would be added to the building. A pool and lounging area would also be added on the roof.

According to Cocoziello, under the Restructuring Plan, the net monthly rent chargeable for a one-bedroom unit at 80% AMI, after subtracting a utility allowance, was $1053. He explained that the $1053 rent was "a potential collection . . . it's not what the market would bear." He agreed that the market study included in the Restructuring Plan estimated that achievable market rent for a one-bedroom unit was $875 in February 2016, and that, under Scenario B, the Plan assumed rents for the first six years that were less than $1053.

Cocoziello explained that MBT III would take title to the property under the Restructuring Plan. The Plan anticipates securing construction financing of

---

[21] In his testimony, Cocoziello used "AMI" to refer to the income restrictions on the rent-restricted units, rather than "AMGI," the term used in the HMFA Deed, which comes from the definition of a "qualified low-income housing project" in 26 U.S.C. § 42(g)(1). The trial court also refers to AMI in its order.

$6,950,000, based on the projected sales of the market-rate units, which is expected to generate $12.2 million in income. The Plan also anticipates securing a "five-year amortizing renewable term loan" for $4,950,000 based on the belief that the ninety-one restructured affordable units could support that amount of indebtedness. MBT III would assume the ECIA Bond indebtedness, and PAC Capital would agree to "resize[] that indebtedness," which Cocoziello claimed was $11 or $12 million including interest, to $7 million, and to subordinate it to the new financing. MBT III would also assume $2 million owed on the loan to CURDC and $500,000 in fees owed to Rubicon.[22] Cocoziello would also invest $2 million in new cash.[23]

According to Cocoziello, absent a further subsidy from the State, "[t]here [was] no way to support the kind of debt that [his] professionals [were] telling [him was] required to repair [the] building" without including market-rate units. In addition, the affordable units rented to new tenants were proposed at 80% AMI rents, rather than 50% AMI rents, because the higher rental income "would

_____

[22] The Plan does not identify which Rubicon entity, Rubicon Development, LLC or Rubicon Properties, LLC, is owed the fees.

[23] It is unclear whether this cash would be provided by Cocoziello or one of the entities he controls. The additional investment is identified on the Restructuring Plan simply as "Dev. Note/Other Equity."

help substantially convince a bank to lend . . . the kind of money that's needed to fix the building."

The market-rate units were to be located in areas of the building that would "command the most dollars." Cocoziello claimed the proposed amenities were needed to be competitive with other housing projects. He asserted that the Plan was "the best we can do."

After MBT II defaulted on the ECIA Bonds, Cocoziello directed MTTC "to file a complaint and foreclosure with the goal of restructuring the properties." He denied that the foreclosure was filed to eliminate affordability restrictions. He contended that when the complaint was filed, there were ongoing negotiations with the HMFA to restructure the financing of the building as 100% affordable housing. However, Cocoziello admitted at the plenary hearing that the goal was now to remove the original affordability restrictions. Those restrictions would be replaced with revised restrictions under the Plan which included some market-rate units. He maintained that "[t]he purpose of the foreclosure was to clear title so that new debt financing could be secured to provide as many affordable units as financial[ly] feasible ."

Apart from Cocoziello, the trial court also considered testimony from Anthony Cuccia, a financial expert who helped Cocoziello prepare the Plan;

Urban, who explained the HMFA's role in the project; Joseph Grandizio, who supervised the general maintenance of the building; Richard Montemore, the administrator of the DCA's Balanced Housing Program; and Craig Domalewski, an attorney for PAC Capital who assisted in exploring financing options for the project.

The Trial Court's May 22, 2018 Decision

After considering this testimony and voluminous exhibits, the trial court issued its forty-one-page written opinion on May 22, 2018. The court also issued a detailed companion order that same day, several portions of which are now challenged on this appeal.

As a threshold matter, the trial court determined that the Responding Defendants[24] had failed to establish a lack of adversity between the parties to the foreclosure action sufficient to prevent the court from adjudicating the matter. It ruled that defendants were barred by res judicata from relitigating the adversity issue because the court had previously addressed it in Royal Tax Lien

---

[24] The court used the term "Responding Defendants" to refer, collectively, to the City, DCA, HMFA and Litigating Tenants.

Services, LLC v. Beach Creek Marina.[25]  The court was also "independently satisfied" that the parties to the foreclosure action were sufficiently adverse.

Turning to the merits, the court found that "[d]ue to the storm damage caused by Hurricane Sandy," MBT II was in default of its obligation under the ECIA Mortgage to "keep the Property in good condition and order and in a rentable and tenantable state of repair."  That default constituted a breach of the ECIA Loan Agreement and the Indenture.  Because the cure periods had expired, the court found that foreclosure could be entered.

The court then addressed the effect of the foreclosure on the HMFA and DCA affordability controls.  For starters, the court observed "it [was] critical to first identify the priority of liens on the project as a foreclosure [would] only divest subordinate interests."  The court found that, "given the actual and statutory notice given to Responding Defendants there was an agreement between the parties for the ECIA Bond Mortgage to be in a first lien position."  However, "even in the absence of an express agreement, under the doctrine of equitable subrogation, [it] ha[d] the power to prioritize the ECIA Bond

---

[25]  The court was referring to an unpublished Law Division decision filed by the first Chancery Division judge on July 16, 2013, in a foreclosure action filed by Royal Tax Lien Services LLC, which had purchased tax sale certificates issued by the City of North Wildwood against MBT II and Beach Creek.

Mortgage against competing liens on the property."

Most pertinent to the present appeal, the court ruled that the federal and state affordability controls specified in the HMFA and DCA transactions were terminated upon the entry of foreclosure, pursuant to 26 U.S.C. § 42 (h)(6)(E)(i). The court recognized that the AHA stated that the affordability controls could not be terminated by a judgment of foreclosure. However, the court determined that the language in the AHA conflicted with the Balanced Housing Program rules, specifically N.J.A.C. 5:43-4.1 and N.J.A.C. 5:80-26.1, which excluded units qualifying for the federal LIHTC program from compliance with those rules.

The court specifically found that, because the DCA regulations "expressly defer[red] to federal law in situations involving a LIHTC property," 26 U.S.C. § 42 (h)(6)(E)(i) governed "the outcome of the affordability controls upon the entry of foreclosure." In addition, the court noted that the HMFA Deed stated that it was governed by Section 42 of the IRC, and that, pursuant to Section 42, the affordability restrictions would terminate upon foreclosure.

The court rejected the Responding Defendants' argument that the affordability restrictions should not be terminated because the foreclosure had been planned by Cocoziello and related entities. The court found that, under 26

U.S.C. § 42 (h)(6)(E)(i), "only the Secretary of the Treasury may intervene to prevent a foreclosure if there is a belief that the foreclosure is planned or arranged with the goal of terminat[ing] affordability restrictions." The Secretary has not done so.

To remedy this fiscally-distressed situation, the court approved the Restructuring Plan proposed by PAC Capital. The court found the Plan "offer[ed] the only option presently available to the Court to achieve the full renovation of the property and rehabilitation of this important public resource." The court declared that the "Restructuring Plan [was] in compliance with Section 116 of the CIAL." The court reasoned that Section 116 gave it broad equitable powers to deal with properties in financial distress. As the court noted, those powers "include[d] the ability to eliminate or reduce the scope of the deed restrictions on the units, change the affordability requirements of the units, transfer rights to a new entity and/or permit the new entity to sell or lease a certain number of units."

In the court's assessment, "the only way to protect the interest of PAC Capital as bondholder while simultaneously maximizing affordable housing [was] to order acquiescence of all parties to the proposed Restructuring Plan as monitored as set forth [in the court's opinion]." Further, the court found no

evidence that Restructuring Plan and foreclosure had been "proposed in bad faith."

The court found that a Special Master should be appointed to oversee the execution of the Restructuring Plan. It denied the Litigating Tenants' request for the appointment of a receiver.

<u>The Court's Order</u>

The court's companion order approved the Restructuring Plan "as may be modified or amended by the Special Master" and approved by the court. The order described the responsibilities of the Special Master to encompass: (a) review and modify the Restructuring Plan concerning the scope and cost of repairs and "evaluate projected rental incomes at 50%, 60% and 70% AMI to see if more affordable units at lower rents could be preserved"; (b) monitor timelines; (c) ensure the property remains habitable for current tenants; (d) ensure any changes to the scope of work are reasonable and justified; (e) review income and expenses to ensure available funds are properly spent; (f) review complaints regarding the rehabilitation of the property; and (g) report progress semi-annually to the court.

The court further ordered that

> [a]ll restrictions and agreements establishing and
> governing restrictions on affordability and rents

A-5879-17T2

affecting or recorded against the title of the Project . . . are hereby abrogated as of the date the Final Judgment of Foreclosure is entered, including but not limited to the [HMFA Deed, the 2005 amendment to the HMFA Deed, the DCA Deed, the AHA, and the DCA Mortgage].

The court annexed a new Deed Restriction to the order, and required that, "[a]s of the date the Final Judgment of Foreclosure is entered, . . . [it] shall [be] duly executed and promptly filed for recording with the Cape May County Clerk." The Deed Restriction recited that certain units had to be rented to "low- or moderate-income persons comprising a household . . . fifty-five (55) years of age or older." It also specified that the number of rent–restricted units "shall not number less than the elective minimum set-aside provided pursuant to 26 U.S.C. § 142 (d)."

The court further ordered that the PILOT Agreement between the City and MBT II "shall be assigned to MBT III or other successor urban renewal entity." That agreement shall remain in full force and effect for units that are part of the Unrestricted Project Portion[26] until the units are sold at market rate and written notice of the relinquishment of tax-exempt status is provided to the City. Units

---

[26] The court order indicates that this term is defined in the Restructuring Plan. However, the Plan included in the appellate record does not define the term. Presumably, the term refers to units that will be converted to market rate units.

that are part of the Affordable Portion Project[27] "shall remain subject to the [PILOT] Agreement for the term thereof."

The court's order further established the priority of the mortgage liens on the property as follows: the ECIA Mortgage first, the CURDC Mortgage second, and the DCA Mortgage third.

The order established deadlines for filing necessary applications and documents related to construction. It mandated that construction begin within six months after receipt of governmental approvals and conclude within thirty-six months of "the Closing."[28] The court required any proceeds or damage awards received from the pending insurance litigation, net of attorneys' fees, to be used to fund the rehabilitation and repair costs. The receivership action was dismissed.

On June 21, 2018 the court ordered MTTC to "submit an appropriate application for final judgment of foreclosure and sale consistent with [his] [o]pinion for the Court to consider." To date, no final judgment of foreclosure

---

[27] The court order indicates this term is defined in the Restructuring Plan. However, the Plan provided in the record does not define the term. Presumably, this refers to units that will remain income restricted.

[28] The order does not specify but perhaps is referring to the closing of financing for the project.

has been entered.

The State's Appeal and the Court's Denial of a Stay

The trial court denied the DCA's motion for a stay of its May 22, 2018 decision pending appeal. The DCA and the HMFA then filed the present appeal.

As we have already noted, the main focus of the State agencies' appeal is on the trial court's elimination of the affordability housing restrictions, and its approval of a Plan that scales back those restrictions to allow for some market-rate units within the project.

II.

The question of whether the HMFA and DCA affordability controls are eliminated by a judgment of foreclosure requires an interpretation of the federal law, the UHAC and the DCA's associated Balanced Housing Program rules, and the various contract documents. Our review of this question of law is de novo. Kieffer v. Best Buy, 205 N.J. 213, 222 (2011).

The LIHTCs

"First enacted in 1986 (Pub. L. No. 99–514, 100 Stat. 2189), 26 U.S.C. § 42 provides an incentive for the construction and rehabilitation of low income rental housing by lowering its overall cost through the use of tax credits to developers and owners of qualified rental projects." In re Adoption of 2003 Low

Income Housing Tax Credit Qualified Allocation Plan ("In re Adoption of 2003 QAP"), 369 N.J. Super. 2, 11 (App. Div. 2004) (citing David Phillip Cohen, Improving the Supply of Affordable Housing: The Role of the Low–Income Housing Tax Credit, 6 J.L. & Pol'y 537, 541 (1998)).

"To qualify [for LIHTCs], a project may set aside 20% or more of the building's residential units to renters whose income is 50% or less than the area's median gro[ss] income . . . , or set aside at least 40% or more of its units to tenants whose incomes are no greater than 60% of the area's median gross income . . . ." Id. at 12; see 26 U.S.C. § 42(g)(1). In addition, rents must be restricted to no more than thirty percent of the income limitation for each unit. 26 U.S.C. § 42(g)(2)(A); see Lance Bocarsly & Rachel Rosner, The Low Income Housing Tax Credit: A Valuable Tool for Financing the Development of Affordable Housing, 33 No. 1 Prac. Real Est. Law. 29, 32 (Jan. 2017).

"The [LIHTC] program is administered by a state's housing credit agency, 26 U.S.C. § 42(m), which in New Jersey is the HMFA." In re Adoption of 2003 QAP, 369 N.J. Super. at 12. The HMFA is therefore responsible for allocating LIHTCs in this State to eligible projects. Id. at 12-14; 26 U.S.C. § 42(h)(3), (m).

Once awarded, LIHTCs may be claimed over a ten-year "credit period,"

26 U.S.C. § 42(a), beginning "the taxable year in which the building is placed in service, or . . . the succeeding taxable year," if the taxpayer so elects. 26 U.S.C. § 42(f)(1). LIHTCs are subject to recapture by the IRS during the "compliance period," which is the fifteen years beginning the first year of the credit period. Bocarsly & Rosner, 33 No. 1 Prac. Real Est. Law. at 32; 26 U.S.C. § 42(i)(1), (j)(1).

LIHTCs may not be claimed for any taxable year "unless an extended low-income housing commitment is in effect as of the end of such taxable year." 26 U.S.C. § 42(h)(6)(A); accord Carter v. Md. Mgmt. Co., 377 Md. 596, 604 (Md. 2003). An "extended low-income housing commitment" is defined as

> any agreement between the taxpayer and the housing credit agency –
>
> (i) which requires that the applicable fraction[29] . . . for the building for each taxable year in the extended use period will not be less than the applicable fraction specified in such agreement . . . ,
>
> (ii) which allows individuals who meet the income limitation applicable to the building . . . the right to enforce in any State court the

---

[29] The "applicable fraction" is the fraction of the building dedicated to low-income housing based on either the number of low-income units as compared to total residential rental units or the floor space of the low-income units compared to the total floor space of the residential units in the building. 26 U.S.C. § 42 (c)(1)(B).

A-5879-17T2

requirement and prohibitions of clause (i),

. . . .

(v) which is binding on all successors of the taxpayer, and

(vi) which, with respect to the property, is recorded pursuant to State law as a restrictive covenant.

[26 U.S.C. § 42(h)(6)(B).]

The "extended use period" begins on the first day of the compliance period. It ends the <u>later</u> of fifteen years after the end of the compliance period <u>or</u> the date specified by the housing credit agency in the extended low-income housing commitment. 26 U.S.C. § 42(h)(6)(D).

<u>Early Termination</u>

A key provision in the federal law concerning the LIHTCs allows for early termination of the extended use period. The provision states that "[t]he extended use period for any building shall terminate . . . on the date the building is acquired by foreclosure (or instrument in lieu of foreclosure) unless the Secretary determines that such acquisition is part of an arrangement with the taxpayer a purpose of which is to terminate such period . . . ." 26 U.S.C. § 42(h)(6)(E)(i)(I). The federal statute does not directly terminate the rent and occupancy restrictions but, rather, terminates the time period that the restrictions

must be imposed.[30]

<u>The Extended Compliance Period</u>

The HMFA Deed entered into by Beach Creek, MBT and the HMFA in December 2002, comprises the "extended low-income housing commitment" required by 26 U.S.C. § 42(h)(6)(A), (B). The HMFA Deed stated that MBT had irrevocably elected the federal set-aside that required "20% . . . or more of the residential units [to be] both rent restricted and occupied by individuals whose income is 50% or less of . . . AMGI." However, the applicable fraction was 100%, meaning that MBT agreed at the outset to keep the federal rent and occupancy restrictions in place for <u>all</u> residential units in Marina Bay Towers for the term of the agreement.

Because MBT had elected to increase the compliance period to improve the competitive score of its application for tax credits, the HMFA Deed also provided for an "extended compliance period," which increased the fifteen-year compliance period defined in 26 U.S.C. § 42(i)(1) by an additional fifteen years. The "extended use period," as set forth in 26 U.S.C. § 42(h)(6)(D), encompassed another fifteen years beyond the extended compliance period, for a grand total of forty-five years. Therefore, the HMFA Deed provided that it "shall

---

[30] The parties have not cited any case law interpreting this provision.

extinguish at the close of the [forty-fifth] year after the beginning of the compliance period unless terminated by foreclosure or instrument in lieu of foreclosure."

<u>This Foreclosure Action and Its Impact Upon the HMFA Deed</u>

Under the plain terms of 26 U.S.C. § 42(h)(6)(E)(i)(I), the extended use period and the rent and occupancy restrictions in the HMFA Deed will necessarily terminate on the date the building is acquired by foreclosure, regardless of whether the Restructuring Plan is eventually implemented. The trial court correctly recognized this.

The State argues that 26 U.S.C. § 42(h)(6)(E)(i)(I) should not apply, because the LIHTCs were partially recaptured. That argument is not supported by the language of the statute. The State cites as authority to <u>Nordbye v. BRCP/GM Ellington</u>, 266 P.3d 92, 104 (Or. Ct. App. Oct. 26, 2011). However, that Oregon opinion is inapposite, as neither a foreclosure nor recapture were at issue in that case. Further, as the trial court correctly found, "recapture allows for the return of claimed, but unearned, LIHTC credits" and does not "result[] in the expulsion from the LIHTC program." <u>See</u> 26 U.S.C. § 42(j).

For these reasons compelled by federal law, we therefore affirm the trial court's order expunging the HMFA Deed, and its associated affordability

restrictions, as of the date that a final judgment of foreclosure is entered.

Foreclosure's Impact on The DCA Affordability Controls

Although the DCA awarded the Balanced Housing Program funds to the City for the benefit of MBT in September 1997, the AHA and DCA Deed were not executed until nine years later in November 2006. The DCA Deed required its terms to be interpreted in accordance with regulations promulgated under the FHA, which were incorporated by reference. It provided that, in the event of any conflict, the FHA and the associated regulations "shall govern."

Inapplicability of the Uniform Housing Affordability Controls

At the time that the DCA Deed and the AHA were executed in 2006, the terms of the Uniform Housing Affordability Controls ("UHAC"), N.J.A.C. 5:80-26.1 to -26.26, were in place.[31] Since its adoption in 2001 the UHAC has

---

[31] As explained by the court in In re Adoption of Uniform Housing Affordability Controls, 390 N.J. Super. 89, 95-96 (App. Div. 2007) (citations omitted), initially

> [t]hree agencies, COAH, the [DCA], and the HMFA each adopted distinct sets of rules establishing controls on the continuing affordability of housing constructed pursuant to the FHA. To remedy inconsistent and overlapping aspects of those regulations, in 2001, the HMFA repealed its rules and replaced them with the [UHAC], which were also adopted by COAH and by the DCA for its Balanced Housing [P]rogram.

specified that the rules, which provide for "the establishment and administration of affordability controls on restricted units that . . . receive funding  . . . under [DCA's] Balanced Housing Program[,] . . . do not apply  to units qualifying for the Federal Low-Income Housing Tax Credit under Section 42 of the [IRC]." (Emphasis added).  N.J.A.C. 5:80-26.1; 33 N.J.R. 3432(b), 3437 (Oct. 1, 2001).

The Federal Standards Statement when the UHAC was issued in 2001, stated that "[a]s adopted, these rules do not contain any standards or requirements that exceed standards or requirements imposed by Federal law. The Uniform Controls are designed to implement a State law mandate, the [FHA], and to apply in cases where there are no controlling Federal standards." 33 N.J.R. 3437.

The UHAC includes detailed restrictions on rents and tenant income eligibility.  N.J.A.C. 5:80-26.12 to -26.13.  However, as explicitly stated in N.J.A.C. 5:80-26.1 and correctly found by the trial court, because the project qualified for federal LIHTCs, the UHAC does not apply to this project.

The AHA and Other Affordability Controls

Therefore, we must next consider: (1) whether, in the absence of the application of the UHAC, affordability controls nevertheless could be imposed by the agreements entered into by the parties, including the AHA; and (2)

whether 26 U.S.C. § 42 prevents parties who received both Balanced Housing Program funds and LIHTCs from contracting to maintain affordability controls in the event of foreclosure.

As we have noted, the AHA the State entered into with MBT contained a provision stating that it "shall not be terminated in the event of judgment of [f]oreclosure." It also provided that "[t]he terms of this Agreement shall be interpreted so as to avoid financial speculation or circumvention of the purposes of the [FHA] for the duration of this Agreement and to ensure, to the greatest extent possible, that the . . . rents of designated Affordable Housing units remain affordable to Low and Moderate Income-Eligible Households as defined herein." In a superiority clause, the AHA further provided that MBT "warrants that no other Agreement with provisions contradictory of, or, in opposition to, the provisions hereof has been or will be executed, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations between and among [MBT], the [DCA], and their respective successors."

When the program funds were awarded to MBT in 1997, the program rules then in effect required the execution and recording of an Affordable Housing Agreement, whose provisions constituted restrictive covenants running with the

land. 28 N.J.R. 6(a), 17 (Jan. 2, 1996). Even though the UHAC was adopted by the HMFA in 2001, the Balanced Housing Program rules were not amended to eliminate the affordability control provisions included therein, including the requirement to execute an Affordable Housing Agreement, because they were superseded by the UHAC, until 2007. 33 N.J.R. 3432(b) (Oct. 1, 2001); 38 N.J.R. 3715; 39 N.J.R. 2517(a) (July 2, 2007). The amendment included a new provision, which stated that "all units receiving funding from Balanced Housing shall be subject to the [UHAC]" except "[u]nits excluded from the controls pursuant to N.J.A.C. 5:80-26.1." 38 N.J.R. 3724; 39 N.J.R. 2529; N.J.A.C. 5:43-4.1(a)(1).

Thus, when the AHA in this case was executed in November 2006, the Balanced Housing Program rules still required execution of an Affordable Housing Agreement, even though the rule proposal eliminating that requirement had been published.[32] In addition, N.J.A.C. 5:43-4.1(a), the provision relied on by the trial court to find that the language of the AHA conflicted with the Balanced Housing Program rules, did not exist when the AHA was executed.

---

[32] Although the UHAC does not require execution of an Affordable Housing Agreement, it does contain a requirement that properties that include affordable rental units record a deed restriction that "shall have priority over all mortgages on the property." N.J.A.C. 5:80-26.11(c); see Appendix E to N.J.A.C. 5:80-26.

We discern no reason why the agreed-upon provisions in the various Balanced Housing Program documents, including the Third-Party Agreement, DCA Note, DCA Mortgage, AHMSA, DCA Deed and the AHA, could not be enforced in this case as a contractual matter, if the trial court had deemed that appropriate. The Balanced Housing Program is a separate state source of funding. Nothing in 26 U.S.C. § 42 appears to prohibit a state from imposing affordability controls on LIHTC-recipient projects that are also receiving state funds.In addition, the ECIA Mortgage provided that it was "subject and subordinate to all existing and future easements, deed restrictions, [and] covenants running with the land . . . relating to the Property and to its purpose as low income senior citizen housing." It specifically stated that "the lien created by this Mortgage shall be subject to the provisions of [the DCA Deed]," although it referred to a deed dated July 15, 2005, and the deed in the record was executed November 27, 2006.

Regardless of when the DCA Deed and AHA were executed, the ECIA Mortgage provided that it was subordinate to "all existing and future . . . deed restrictions." Thus, the ECIA Mortgage was subordinate to the restrictions contained in the AHA, the DCA Deed and the DCA Mortgage, and those contractual restrictions would, therefore, survive foreclosure by PAC Capital on

the ECIA Mortgage, subject to the trial court's ultimate authority and zone of discretion we discuss, infra.

No Implied Preemption

MTTC's argument that 26 U.S.C. § 42 preempts the provisions in the AHA is unconvincing.  Express preemption does not exist in 26 U.S.C. § 42.  Absent such express preemption, courts may consider whether preemption is implied.

> There are two forms of implied preemption—field preemption and conflict preemption.  Field preemption applies where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Conflict preemption applies where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.
>
> [In re Reglan Litigation, 226 N.J. 315, 328-29 (2016) (citations and quotations omitted).]

Neither type of implied preemption applies here.  It is not impossible for the extended use period to terminate as to the federal LIHTC program, while affordability controls could remain in place in connection with funds separately provided to the project by the State's Balanced Housing Program.

MTTC claims, without any supporting legal citations, that imposing independent affordability requirements would undermine the LIHTC program.

We disagree. The purpose of the federal program is to provide tax credits that can be sold to investors. In re Adoption of 2003 QAP, 369 N.J. Super. at 11. No evidence has been cited from the record showing that the inclusion of a provision requiring State affordability controls to survive foreclosure would negatively affect the ability to sell LIHTCs to investors.

The trial court consequently erred in determining that the DCA affordability controls would be terminated automatically by a judgment of foreclosure. However, as we discus, infra, the court had other authority to terminate or revise those restrictions in its discretion.

III.

The Court's Exercise of Authority Under Section 116 of the CIAL

The State argues that the court improperly relied on Section 116 of the CIAL, N.J.S.A. 40:37A-116, to extinguish the DCA Mortgage, DCA Deed, and AHA. The State contends that the statute "authorizes sale of the property free [solely] from the limitations of the CIAL, not the limitations imposed by any other Act, agency, or body." The State maintains that "[n]othing in the CIAL or case law authorized the trial court to modify deed restrictions imposed by any other governmental entity."

The State further argues that, even if the CIAL could be relied on to

remove or alter the deed restrictions, before approving the foreclosure the trial court failed to make, and the record does not support, certain required findings. Those findings include that: (1) "the interest of the bondholder cannot otherwise be adequately secured"; (2) "the relief sought is 'reasonable and proper'"; (3) the "project would be sold to a 'qualified housing sponsor'"; and (4) "the proceedings were brought in good faith." The State claims there is no evidence that the proposed Restructuring Plan can be realistically financed and that Cocoziello has "made decisions that were contrary to the interests of the bondholder." In addition, MBT III, the proposed successor to MBT II, allegedly is not a "qualified housing sponsor."

The State further urges that the public interest is not served by the Restructuring Plan because it reduces the overall supply of affordable housing. The State contends that the trial court "improperly invoked unspecified equitable powers under the CIAL to impose new 'affordable housing covenants.'" The State maintains that "[t]hese new 'covenants' are unrelated to the HMFA or DCA covenants and the laws and rules governing affordable housing" and "provide no equivalent protections." The State argues that "the court made no findings sufficient to support an exercise of such extraordinary equitable powers." The City joins in these contentions.

The Litigating Tenants, meanwhile, argue that the rents on the remaining ninety-one affordable units under the Restructuring Plan – whose occupancy would be limited to persons earning 80% or less of AMI – would be "higher than actual market rent, rendering the rent restrictions virtually meaningless." They further maintain that the new Deed Restriction approved by the court, is inconsistent with the Restructuring Plan, because it provides that "[t]he number of Restricted Units during the Restricted Term shall not number less than the elective minimum set-aside provided pursuant [to] 26 U.S.C. § 142(d)" and the Restructuring Plan allegedly does not conform to the federal set-aside.

The Litigating Tenants point out that the Deed Restriction "does not state a specific term of years" and affords no protection to existing tenants in the event of foreclosure. They claim that because Cocoziello exclusively controls whether the ECIA and CURDC Mortgages will be satisfied or placed in default, "the protections purportedly offered by the proposed deed restrictions are illusory." In addition, they claim the Deed Restriction provides only "vague rights" to the City to enforce the restrictions.

The Litigating Tenants further argue that the trial court abused its discretion by approving deed restrictions that "fail to provide meaningful, long-term protection of any of the 142 Marina Bay Towers Units as affordable

housing." They fault the trial court for "totally eliminating all restrictions and substituting . . . clearly inadequate deed covenants," rather than "simply lifting current restrictions off of a certain number of units."

The Court's Powers Under Section 116

The question of whether the trial court properly exercised powers granted to it within the CIAL by N.J.S.A. 40:37A-116 is a two-part question involving two different standards of review. The first question – what powers are granted to the trial court by the statute – is a matter of statutory construction subject to de novo review. Klawitter v. City of Trenton, 395 N.J. Super. 302, 318 (App. Div. 2007). As to the second question, if the CIAL indeed affords discretion to the trial court, then the court's decision must be reviewed for abuse of discretion. Under this latter standard, "an appellate court should not substitute its own judgment for that of the trial court, unless the trial court's ruling was so wide of the mark that a manifest denial of justice resulted." Hanisko v. Billy Casper Golf Mgt., Inc., 437 N.J. Super. 349, 362 (App. Div. 2014) (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

It is well settled that when interpreting a statute, the primary goal is to give effect to the intent of the Legislature. State v. Lenihan, 219 N.J. 251, 262 (2014). "[T]he best indicator of that intent is the plain language chosen by the

Legislature." Ibid. (quoting State v. Gandhi, 201 N.J. 161, 176 (2010)). "'[W]ords and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language.'" State v. Hupka, 203 N.J. 222, 232 (2010) (quoting N.J.S.A. 1:1-1).

"If the statute is clear and unambiguous on its face and admits of only one interpretation, [a court] need delve no deeper than the act's literal terms to divine the Legislature's intent." State v. Butler, 89 N.J. 220, 226 (1982); accord Gandhi, 201 N.J. at 180. "A court may neither rewrite a plainly-written enactment of the Legislature nor presume that the Legislature intended something other than that expressed by way of the plain language." O'Connell v. State, 171 N.J. 484, 488 (2002). "If the text, however, is susceptible to different interpretations, the court considers extrinsic factors, such as the statute's purpose, legislative history, and statutory context to ascertain the legislature's intent." Twp. of Pennsauken v. Schad, 160 N.J. 156, 170 (1999).

N.J.S.A. 40:37A-116, the key statutory provision that was relied on by the trial court to approve the Restructuring Plan, states, in relevant part, that:

> Subject to the terms of any applicable agreement, contract or other instrument entered into or obtained

pursuant to section 23 of this act, [33] judgment of foreclosure shall not be entered unless the court to which application therefor is made shall be satisfied that the interest of the lienholder or holders cannot be adequately secured or safeguarded except by the sale of the property; and in such proceeding the court shall be authorized to make an order increasing the rental or carrying charges to be charged for the housing accommodations in the housing project involved in such foreclosure, or appoint a member of the authority or any officer of the municipality in which any tax exemption with respect to the projects provided, as a receiver of the property, or grant such other and further relief as may be reasonable and proper; and in the event of a foreclosure or other judicial sale, the property shall be sold only to a qualified housing sponsor which will manage, operate and maintain the project subject to the provisions of this act, unless the court shall find that the interest and principal on the obligations secured by the lien which is the subject of foreclosure cannot be earned under the limitations imposed by the provisions of this act and that the proceeding was brought in good faith, in which event the property may be sold free of limitations imposed by this act or subject to such limitations as the court may deem advisable to protect the public interest.

[(Emphasis added) (footnotes omitted).]

This provision was enacted by L. 1979, c. 275, which amended the CIAL

to "vest[] [county improvement authorities] with necessary powers to undertake,

---

[33] Section 23 of L. 1979, c. 275, authorized a county improvement authority to obtain insurance or a guarantee as to the repayment of interest and/or principal on any loan made under the act from any department or agency of the United States. N.J.S.A. 40:37A-128.

finance and operate housing projects and to redevelop property in connection therewith." The Sponsor's Statement noted that the law was "modeled after the statutes creating the Housing Finance Agency [L. 1967, c. 81] and the Mortgage Finance Agency [L. 1970, c. 38]." Sponsor's Statement to A. 3430 (L. 1979, c. 275).

The language in N.J.S.A. 40:37A-116 was taken verbatim from L. 1967, c. 81, § 13, which was originally codified at N.J.S.A. 55:14J-13. That statute was repealed by L. 1983, c. 530, which consolidated the Housing Finance Agency and Mortgage Finance Agency and established the HMFA. N.J.S.A. 55:14J-13 was replaced by N.J.S.A. 55:14K-10, which remains in place today and contains language substantially identical to that in N.J.S.A. 40:37A-116.[34]

N.J.S.A. 40:37A-116 thereby provides that a judgment of foreclosure in a project subject to the CIAL cannot be entered unless a court is satisfied that the interests of the bondholder cannot be adequately protected except through foreclosure. In such a foreclosure proceeding, the court may: (1) increase the rent charged for the units in the project; (2) appoint a receiver; or (3) "grant such other and further relief as may be reasonable and proper." N.J.S.A. 40:37A-116.

---

[34] There is no case law interpreting N.J.S.A. 40:37A-116 or the HMFA foreclosure provision. The legislative histories of the laws that are available to us shed no light on these foreclosure provisions.

<u>The Trial Court's Application of Section 116 to the Circumstances of This Case</u>

Although the State argues that the record contains no evidence that PAC Capital's interests could be adequately protected only through the Restructuring Plan, that argument misreads the statute. The relief provided under the statute need only be "reasonable and proper" and, therefore, does not have to be the sole potential remedy for protecting the bondholder's interests in the event of foreclosure. In any event, the court did find that no other viable option had been presented to it.

As we have already noted, the trial court found that MBT II was in default of its obligations under the ECIA Loan Agreement and the ECIA Mortgage because it failed to fund the repairs necessary to rehabilitate the building. The court specifically found that, in the wake of that default, the Restructuring Plan was "the only option presently available to the Court to achieve the full renovation of the property," and that "the only way to protect the interest of PAC Capital as bondholder while simultaneously maximizing affordable housing [was] to order acquiescence of all parties to the proposed Restructuring Plan."

These findings are amply supported by the record and are sufficient under the statute. The court reasonably found that no other viable plan to rehabilitate the building had been presented, and there was no dispute that the building

required extensive repairs.

Given the circumstances presented, the trial court did not misapply its discretion in approving the Restructuring Plan as a means to both salvage the project while being mindful of the bondholder's legitimate financial interests. The court equitably attempted to navigate a fair resolution among the competing interests. The court understandably appointed a Special Master to assist in the implementation of that complex Plan. Even so, certain sub-issues under Section 116 must be addressed.

Whether MBT III is a "Qualified Housing Sponsor"

As noted, the CIAL provides that "in the event of a foreclosure . . . the property shall be sold only to a qualified housing sponsor." N.J.S.A. 40:37A-116. The qualified housing sponsor must "manage, operate and maintain the project subject to the provisions of this act" unless two conditions are met: (1) "the interest and principal on the obligations secured by the lien which is the subject of foreclosure cannot be earned under the limitations imposed by the provisions of this act"; and (2) the foreclosure was "brought in good faith." Ibid. If the conditions are satisfied, "the property may be sold free of limitations imposed by this act or subject to such limitations as the court may deem advisable to protect the public interest." Ibid.

The trial court did not specifically find that MBT III, the entity that is proposed in the Plan to take over the project, was a "qualified housing sponsor." The CIAL defines the term "qualified housing sponsor," with substantial precision, as:

> (1) any housing corporation heretofore qualified under the provisions of the "Limited-Dividend Nonprofit Housing Corporations or Associations Law," P.L.1949, c. 184 (C.55:16-1 et seq.), repealed by P.L.1991, c. 431, (2) any urban renewal corporation or association heretofore qualified under the provisions of the "Urban Renewal Corporation and Association Law of 1961," P.L.1961, c. 40 (C.40:55C-40 et seq.), repealed by P.L.1991, c. 431, or any urban renewal nonprofit corporation or association heretofore qualified under the provisions of the "Urban Renewal Nonprofit Corporation Law of 1965," P.L.1965, c. 95 (C.40:55C-77 et seq.), repealed by P.L.1991, c. 431, which has as one of its purposes the construction, rehabilitation or operation of housing projects, (3) any general corporation formed under the provisions of Title 14 of the Revised Statutes or Title 14A of the New Jersey Statutes, which has as one of its purposes the construction, rehabilitation or operation of housing projects, (4) any corporation or association organized not for profit under the provisions of Title 15 of the Revised Statutes or any other law of this State, which has as one of its purposes the construction, rehabilitation or operation of housing projects, (5) any horizontal property regime formed under the "Horizontal Property Act," P.L.1963, c. 168 (C.46:8A-1 et seq.) or any condominium formed under the "Condominium Act," P.L.1969, c. 257 (C.46:8B-1 et seq.), which has as one of its purposes the construction, rehabilitation or operation of housing projects, and (6)

any individual, partnership, limited partnership, joint venture or other association, including a partnership, limited partnership, joint venture or association in which the authority is a general or limited partner or participant, approved by the authority as qualified to own, construct, rehabilitate, operate, manage and maintain a housing project.

[N.J.S.A. 40:37A-107(j) (footnote omitted).]

The CIAL permits county improvement authorities to extend loans to qualified housing sponsors. N.J.S.A. 40:37A-108. Presumably, the ECIA, as a county improvement authority, determined that MBT II was a "qualified housing sponsor" under N.J.S.A. 40:47A-107(j) when it executed the ECIA Loan Agreement and ECIA Mortgage in 2005.[35] Cocoziello testified that MBT III has been formed as the successor entity to MBT II, but he gave no specifics as to its ownership, other than noting it has a general partner.

As a limited partnership, in order for MBT III to be a "qualified housing sponsor," N.J.S.A. 40:37A-107(j)(6) requires the ECIA to approve MBT III "as qualified to own, construct, rehabilitate, operate, manage and maintain a housing project."

There is no express approval by the ECIA of that qualification in the

---

[35] The ECIA Mortgage, ECIA Loan Agreement and the May 24, 2005, ECIA resolution authorizing the sale of the ECIA Bonds do not mention the term "qualified housing sponsor."

record. However, the ECIA is surely familiar with the Restructuring Plan, as it is a party to both the foreclosure and receivership actions. The ECIA's attorney and Executive Director participated in the settlement discussions. That attorney also appeared at trial and briefly questioned Cocoziello regarding the Plan.

The ECIA has not filed a brief in the appeal. Nor has it expressed any objection to the Restructuring Plan or the transfer of MBT II's interests in the project to MBT III. Under the distinctive circumstances presented here, it is reasonable to infer that the ECIA has at least tacitly approved MBT III as a "qualified housing sponsor." Even so, an express finding by the trial court is necessary.

Limitations Imposed By the CIAL

Regarding the limitations imposed by the CIAL, MTTC argues that the phrase "limitations imposed by this act" encompasses the federal restrictions imposed by 26 U.S.C. § 142(d), while the State claims the limitations are those imposed by the CIAL. We are persuaded that the phrase covers both the federal and state limitations.

The plain meaning of the term "this act" in N.J.S.A. 40:37A-116 is the amendment to the CIAL that was enacted by L. 1979, c. 275. The 1979 enactment included provisions concerning loans that could be made by county

improvement authorities to qualified housing sponsors and who could occupy projects that received such financing. L. 1979, c. 275, §§ 4-9. Specifically, the law provided, as it currently does in N.J.S.A. 40:37A-113, that occupancy "shall be limited to families of low and moderate income whose gross aggregate family income at the time of admission does not exceed six times the annual rental or carrying charges . . . or seven times said charges if there are three or more dependents." L. 1979, c. 275, § 8. The law also provided that loans "shall be subject to an agreement between the authority and the qualified housing sponsor which will subject said qualified housing sponsor . . . to limitations established by the authority as to rentals and other charges." L. 1979, c. 275, § 6 (currently codified at N.J.S.A. 40:37A-111(e)). Thus, under a plain language reading of the statute, the phrase "the limitations imposed by this act" is a reference that sweeps in the limitations imposed by the other sections of L. 1979, c. 275.

Presumably, the ECIA Loan Agreement is the agreement required by N.J.S.A. 40:37A-111(e), although the parties have not identified it as such and the agreement itself does not cite the statute. The ECIA Loan Agreement required MBT II to operate the project as a "qualified residential rental project" as defined in 26 U.S.C. §142(d). Thus, the limitations imposed by the CIAL were, at least in part, the federal restrictions.

66

Under the CIAL, the ECIA was also required to obtain a mortgage on the project. N.J.S.A. 40:37A-111(d). The ECIA Mortgage provided that it was subject specifically to the deed restrictions contained in the HMFA Deed and the DCA Deed as well as to "all existing and future . . . deed restrictions [and] covenants running with the land . . . relating to the Property and to its purposes as low income senior citizen housing." Thus, the phrase "limitations imposed by this act" in N.J.S.A. 40:37A-116, incorporates both the federal restrictions in 26 U.S.C. §142(d), as well as the restrictions imposed by the HMFA Deed, the DCA Deed, the AHA and the DCA Mortgage.

Moreover, even if the DCA affordability controls were not encompassed within the limitations imposed by the CIAL, removal of limitations imposed by the CIAL is not a court's only option in fashioning a remedy for a financially distressed property. Once a court determines that the foreclosure was brought in good faith and that the principal and interest on the secured bonds cannot be earned with the CIAL restrictions in place, the property may be sold free and clear of those restrictions "or subject to such limitations as the court may deem advisable to protect the public interest." N.J.S.A. 40:37A-116 (emphasis added). Thus, the court had discretion to approve the Restructuring Plan with its proposed affordable housing restrictions regardless of whether the DCA

affordability controls were encompassed within the limitations imposed by the CIAL.  See Atl. Container, Inc. v. Twp. of Eagleswood Planning Bd., 321 N.J. Super. 261, 270 n.4 (App. Div. 1999) ("'[o]rdinarily, the word 'or' in a statute is to be considered a disjunctive particle indicating an alternative'") (quoting Murphy v. Zink, 136 N.J.L. 235, 239 (Sup. Ct. 1947), aff'd, 136 N.J.L. 635 (E. & A. 1948)); see also Alexander v. Bd. of Review, 405 N.J. Super. 408, 417 (App. Div. 2009) ("'or' is ordinarily considered to be a disjunctive particle").

As discussed, supra, the HMFA Deed restrictions will be eliminated if there is a final judgment of foreclosure.  By contrast, as explained above, the contractual DCA affordability controls could theoretically survive foreclosure. The trial court recognized that Cape May County had a "particular shortage" of housing for senior citizens of modest income and determined that Marina Bay Towers was an important public resource.  Ultimately, it found pursuant to N.J.S.A. 40:37A-116, that the interest and principal on the ECIA Loan could not be earned with those restrictions in place, determining that "the only way to protect the interest of PAC Capital as bondholder while simultaneously maximizing affordable housing [was] to order acquiescence of all parties to the proposed Restructuring Plan."  The court was "mindful that [its] equitable powers should not be exercised except when a failure to do so will work against

the strong public interest, such as preservation of low and moderate income housing, particularly in a geographical area which has such a limited supply." Hence, the DCA affordability controls were justifiably removed, essentially out of fiscal necessity and in the absence of the additional infusion of government funds.

The Impact of N.J.S.A. 40:37A-90

Although the State argues that extinguishing the DCA Mortgage, DCA Deed and AHA affected or limited DCA's rights in violation of N.J.S.A. 40:37A-90, that statute does not prevent the court from exercising its discretion to remove the DCA's affordable housing controls.

N.J.S.A. 40:37A-90 was enacted as section 47 of L.1960, c. 183, which was the original enactment of the CIAL. Under that law, the purpose of every county improvement authority was to provide for (1) public buildings for use by the State, county, municipality or any subdivisions, departments or agencies thereof; (2) structures and facilities for public transportation; and (3) structures or facilities for military or civil aviation. L. 1960, c. 183, § 11. The provision the State relies on says "nothing contained in this act shall in any way affect or limit the jurisdiction, rights, powers or duties of any State regulatory agencies." N.J.S.A. 40:37A-90. There is no case law interpreting this provision. However,

69

the plain meaning of the phrase "this act" is L. 1960, c. 183, an enactment which did not authorize county improvement authorities to grant loans or issue bonds for the purpose of financing housing projects.

When the CIAL was later amended by L. 1979, c. 275, county improvement authorities were authorized to provide loans for low and moderate income housing projects. L. 1979, c. 275, § 32 (currently codified at N.J.S.A. 40:37A-54(i)). In addition to being the source for the foreclosure provision, N.J.S.A. 40:37A-116, relied upon by the trial court, the 1979 act contained two other provisions that support the court's broad equitable powers to remove the DCA affordability controls. The first, L. 1979, c. 275, § 19, codified at N.J.S.A. 40:37A-124, provides that:

> The State of New Jersey does hereby pledge to and covenant and agree with the holders of any bonds, bond anticipation notes or other notes or obligations issued pursuant to the authority of this act that the State will not limit or alter the rights or powers hereby vested in the authority to perform and fulfill the terms of any agreement made with the holders of such bonds, bond anticipation notes or other notes or obligations, or in any way impair the rights or remedies of such holders until such bonds, bond anticipation notes and other notes or obligations, together with interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceedings by or in behalf of such holders, are fully met and discharged or provided for.

The statute prevents the State from insisting that the DCA affordability controls be maintained if doing so would "impair the rights or remedies" available to the bondholder under N.J.S.A. 40:37A-116.

The second provision, L. 1979, c. 275, § 29, codified at N.J.S.A. 40:37A-134, specifies that "[t]he powers enumerated in this act shall be interpreted broadly to effectuate the purposes thereof and shall not be construed as a limitation of powers." Unlike N.J.S.A. 40:37A-90, which, while providing that the 1960 act "shall be construed liberally to effectuate the legislative intent" also imposed the limitation that the rights and powers of other state agencies not be affected, N.J.S.A. 40:37A-134 contains no restriction on the broad interpretation of the 1979 act. There are no cases that cite either N.J.S.A. 40:37A-124 or N.J.S.A. 40:37A-134.

Construed sensibly and in context, the 1979 statute conferred broad powers on the trial court to accomplish the purposes of the act, which would include removing the DCA affordability controls, as long as the court's finding that the obligations under the ECIA Loan could not be met with the controls in place is supported by the record. As explained above, the record in this case supports the trial court's reasonable finding that PAC Capital's interests could not be protected without removal of the low-income restrictions.

71

The trial court specifically found in this regard that "nothing submitted to this Court indicates that the Restructuring Plan and the corresponding foreclosure [were] proposed in bad faith." The court noted that MTTC and PAC Capital "made numerous revisions to the proposed plan to attempt to accommodate the various interested parties." This finding is supported by the record, as Domalewski and Cocoziello testified to discussions with the state entities and attempts made to obtain financing to rehabilitate the project.

"Qualified Residential Rental Project"

Although the trial court addressed the affordability controls imposed by the HMFA and the DCA, it did not specifically address whether the interest and principal on the ECIA Loan could be earned under the restrictions imposed by 26 U.S.C. § 142(d). That statute defines a "qualified residential rental project" as one that elects either to have "20 percent or more of the residential units . . . occupied by individuals whose income is 50 percent or less of [AMGI]" ("20-50 test") or "40 percent or more of the residential units . . . occupied by individuals whose income is 60 percent or less of [AMGI]" (the "40-60 test"). 26 U.S.C. § 142(d)(1). The Restructuring Plan allows existing tenants, who qualified under the original low-income standard in the HMFA Deed as individuals whose income was 50% or less of AMI, to remain in the building.

However, the Plan provides that vacant units will be rented to households whose income is 80% or less of AMI.

As we have noted, the Restructuring Plan anticipates that the rehabilitated building will contain 132 units, of which forty-one will be sold at market rates. At the time of trial, approximately sixty units were occupied, and the amended foreclosure complaint filed in August 2018, lists forty-nine tenant-defendants. The Restructuring Plan projected that by the year 2021, only nineteen of the original tenants would remain. Therefore, by the year 2021, or perhaps sooner, the project will no longer satisfy the "20-50 test." 26 U.S.C. § 142(d) (1)(A). Nor will it satisfy the "40-60 test," 26 U.S.C. § 142(d) (1)(B), because, under the Restructuring Plan, vacant units will be rented to households whose income is 80% or less of AMI.

There was no evidence at trial as to whether financing could be secured to rehabilitate the building if the project was required to meet the 40-60 test. Under the test, occupancy for 60% of the units could presumably be unrestricted. Interestingly, the Restructuring Plan anticipated charging rents that were less than the allowable affordable rent for a one bedroom unit rented to households earning 80% or less of AMI, as it listed the net allowable affordable rent at

$1053, and the projected rent receivable at $875.[36]

This discrete issue is remanded to the trial court for an explicit finding as to whether the obligations under the ECIA Loan can be met if the project is required to satisfy the definition of a "qualified residential rental project" under 26 U.S.C. § 142(d)(1).  The Special Master has been tasked with making a related recommendation to the court after

> [r]eviewing and modifying the proposed Restructuring Plan to better evaluate the proposed scope of repairs, to utilize a more up-to-date cost projection, and to evaluate projected rental incomes at 50%, 60%, and 70% AMI to see if more affordable units at lower rents could be preserved, the objective being to maximize the number of such units[.]

Given the topical overlap, the Special Master should also be tasked to recommend to the court whether the project can remain a "qualified residential rental project" under 26 U.S.C. § 142(d)(1), thus complying with the specified limitations imposed by the CIAL.  N.J.S.A. 40:37A-116.

The Need for a Final Judgment of Foreclosure

Lest it become overlooked, we must emphasize that the trial court's power under N.J.S.A. 40:37A-116 to eliminate the affordability controls and approve

---

[36]  The Restructuring Plan listed the net allowable affordable rent for households earning 60% or less of AMI at $765.

the Restructuring Plan is dependent on a judgment of foreclosure, which has not yet been entered in this case. Thus, on remand, the trial court is directed to enter a final judgment of foreclosure in due course.

Apparent Inconsistency of the Deed Restriction with the Restructuring Plan

As pointed out by the Litigating Tenants, the terms of the proposed Deed Restriction, which the trial court ordered be executed as of the date the final judgment of foreclosure is entered, appears to conflict with the Restructuring Plan. The Deed Restriction states that "[t]he number of Restricted Units during the Restricted Term[37] shall not number less than the elective minimum set-aside

---

[37] The "Restricted Term" is defined in the deed restriction as "beginning on the date the Restricted Unit Property has achieved substantial completion following redevelopment, rehabilitation, repair, construction and/or renovation and ending on the date that coincides with the last day of any new 'qualified project period' pursuant to 26 U.S.C. § 142(d)." "Qualified project period" is defined in 26 U.S.C. § 142(d)(2)(A) as:

> the period beginning on the 1st day on which 10 percent of the residential units in the project are occupied and ending on the latest of--
>     (i) the date which is 15 years after the date on which 50 percent of the residential units in the project are occupied,
> (ii) the 1st day on which no tax-exempt private activity bond issued with respect to the project is outstanding, or

provided pursuant [to] 26 U.S.C. § 142(d)." But as explained above, under the Restructuring Plan projections, by the year 2021, the project will not meet the set-asides provided in 26 U.S.C. § 142(d). Because the Deed Restriction approved by the court appears to conflict with the Restructuring Plan, paragraph 5 of the trial court's order is reversed and remanded for the court to resolve that apparent conflict.

## IV.

The State and the City argue this foreclosure litigation is "pretextual," and the remedy of foreclosure therefore should be disallowed. They argue Cocoziello is essentially the "true plaintiff in in interest," and that he is misusing the foreclosure process to escape the State's affordability controls. They contend there is a lack of adversity in the foreclosure case.

As we have already noted, the trial court found these arguments were barred by principles of res judicata because the State knew of Cocoziello's roles in the various project entities long ago, and an argument of pretextuality could have been raised in previous litigation. We agree.

---

(iii) the date on which any assistance provided with respect to the project under section 8 of the United States Housing Act of 1937 terminates.

A-5879-17T2

Although we recognize Cocoziello's close relationship with MBT II and several of the other entities involved in the financing and development of Marina Bay Towers, the record supports the trial court's finding that the DCA and HMFA were long aware of Cocoziello's ties to all of the entities involved in the financing and development of the project. That awareness surely existed before the HMFA, with the participation of the DCA Director, authorized the second allocation of LIHTCs.

Moreover, notwithstanding Cocoziello's ties to PAC Capital and MBT II, under 26 U.S.C. § 42(h)(6)(E)(i)(I), only the United States Treasury Secretary can prevent termination of the extended use period after a building is acquired by foreclosure through a determination that the "acquisition is part of an arrangement with the taxpayer a purpose of which is to terminate such period." Thus, a determination by a state court that a foreclosure was pretextual would be insufficient to prevent the extended use period from terminating, absent a federal determination in the State's favor by the Secretary. Although requested to do so by the HMFA, the Secretary declined to make such a determination.

We therefore uphold the trial court's rejection of the pretextuality argument.

## V.

The State further argues the trial court improperly rejected the Litigating Tenants' application for a receiver. The State contends in particular that the court did not address whether the Restructuring Plan conformed to the standards set forth in the Receivership Act.

The State asserts that, by appointing a Special Master to "define the scope of necessary repairs, the reasonableness of the plan, whether any additional rent-restricted units can be preserved, and whether the Plan is fiscally viable . . . the [trial] court conceded that the record lacked facts sufficient to support its order." The State argues that appointment of a Special Master is "unwarranted and inappropriate" because the court should have decided the questions it left to the Special Master. The State claims the appointment "amounts to an abdication of the judicial function on the fundamental issues involved in the litigation." The City adopts the State's arguments.

The Litigating Tenants, meanwhile, argue that once a finding is made that the criteria for the appointment of a receiver have been met, the Receivership Act "requires appointment of a receiver or approval of a specific plan by the owner to remedy the conditions." They contend that the trial court determined that the criteria for appointment had been satisfied, but then "failed to make any

A-5879-17T2

findings as to whether the [Restructuring Plan] met the statutory requirements." They claim that there has been no showing that the Restructuring Plan is financially feasible and that MTTC "failed to establish that the code violations and other conditions affecting habitability of the premises . . . would be abated 'within a reasonable period'" as required by the Receivership Act. They argue that "[a] receivership is the most promising option for preserving the building" because the receiver could "address[] any conditions that affect tenants' health and safety, while also investigating whether there are viable options other than the [Restructuring Plan] for preserving the property." Alternatively, in the event that the denial of a receiver is affirmed, the tenants support the appointment of a Special Master.

Interpretation of the Receivership Act

The trial court's determination that it had the discretion to deny appointment of a receiver, is a question of statutory interpretation subject to de novo review. Klawitter, 395 N.J. Super. at 318.

Under the Receivership Act,

> A building shall be eligible for receivership if it meets one of the following criteria:
>
> > a. The building is in violation of any State or municipal code to such an extent as to endanger the health and safety of the tenants as of the date

A-5879-17T2

of the filing of the complaint with the court, and the violation or violations have persisted, unabated, for at least 90 days preceding the date of the filing of the complaint with the court; or

b. The building is the site of a clear and convincing pattern of recurrent code violations, which may be shown by proofs that the building has been cited for such violations at least four separate times within the 12 months preceding the date of the filing of the complaint with the court, or six separate times in the two years prior to the date of the filing of the complaint with the court and the owner has failed to take action as set forth in section 9 of P.L.2003, c. 295 (C.2A:42-122).

A court, upon determining that the conditions set forth in subsection a. or b. of this section exist, based upon evidence provided by the plaintiff, shall appoint a receiver, with such powers as are herein authorized or which, in the court's determination, are necessary to remove or remedy the condition or conditions that are a serious threat to the life, health or safety of the building's tenants or occupants

[N.J.S.A. 2A:42-117 (emphasis added).]

The statutory language quoted above seems internally inconsistent, as it first provides that a building "shall be eligible for receivership" if either of the two criteria are met, but then provides that if a court determines that either of the conditions exist, it "shall appoint a receiver." Ibid.

This apparent ambiguity within N.J.S.A. 2A:42-117 may be resolved by

looking for guidance to a separate portion of the Receivership Act, section 123, which provides that:

> a. If the court determines, after its summary hearing, that the grounds for relief set forth pursuant to section 5 of P.L.2003, c. 295 (C.2A:42-118) have been established, the court may appoint a receiver and grant such other relief as may be determined to be necessary and appropriate. . . .
>
> b. If the court determines, after its summary hearing, that the grounds for relief set forth pursuant to section 5 of P.L.2003, c. 295 (C.2A:42-118) have been established, but the owner presents a plan in writing to the court demonstrating that the conditions leading to the filing of the complaint will be abated within a reasonable period, which plan is found by the court to be reasonable, then the court may enter an order providing that in the event the conditions are not abated by a specific date, including the completion of specific remedial activities by specific dates, or if the conditions recur within a specific period established by the court, then an order granting the relief as requested in the complaint shall be granted.
>
> [N.J.S.A. 2A:42-123 (emphasis added).]

Thus, while a portion of N.J.S.A. 2A:42-117 appears to mandate the appointment of a receiver upon a finding that either of the two criteria set forth in the statute are met, N.J.S.A. 2A:42-123(a) instead appears to leave such an

appointment up to the discretion of the trial court.[38]

The construction of the statute boils down to the use of the terms "shall" and "may." "Under the 'plain meaning' rule of statutory construction, the word 'may' ordinarily is permissive and the word 'shall' generally is mandatory." Aponte-Correa v. Allstate Ins. Co., 162 N.J. 318, 325 (2000). However, "these words are 'interchangeable whenever necessary to execute the clear intent of the Legislature.'" In re Pathmark Stores, Inc., 367 N.J. Super. 50, 59 (App. Div. 2004) (quoting Harvey v. Bd. of Chosen Freeholders of Essex Cty., 30 N.J. 381, 392 (1959)). Because the Receivership Act "is susceptible to different interpretations," it is appropriate to consider its legislative history, which suggests that the trial court should have discretion to appoint or deny a receiver. Twp. of Pennsauken, 160 N.J. at 170.

The Receivership Act was enacted as L. 2003, c. 295. The Sponsor's Statements to both the Assembly and Senate bills explained that the then-current law addressed receivership under three separate statutes, N.J.S.A. 2A:42-79, N.J.S.A. 40:48-2.12h, and N.J.S.A. 54:5-53.1. Sponsor's Statements to A. 2539/S. 1676 (L. 2003, c. 295). Among other things, the Act was intended to

---

[38] There is no case law interpreting these provisions. The cases cited by MBT II are inapposite, as they do not interpret the Receivership Act or statutes that appear to require appointment of a receiver.

change[] the current situation through a series of measures which include[d]:

. . . .

- giving the court <u>broad discretion to appoint the most appropriate entity</u> to act as receiver in light of the circumstances resulting in the receivership action;

. . . .

- <u>granting the court broad discretion to act to further the purposes</u> of the statute, where necessary.

[<u>Sponsor's Statements to A. 2539/S. 1676</u> (<u>L.</u> 2003,  <u>c.</u> 295) (emphasis added).]

N.J.S.A. 40:48-2.12h and N.J.S.A. 2A:42-79, which formerly allowed receivers to be appointed at the discretion of a municipality and the court, were repealed by the Receivership Act.[39]  <u>L.</u> 2003, <u>c.</u> 295, § 32.  As explained by the Supreme Court in <u>Jones v. Buford</u>, 71 N.J. 433, 439-40 (1976), these statutes, along with other legislation "seek[ing] to give remedial relief to tenants against landlords who permit undue deterioration of buildings or who fail to provide satisfactory living conditions, . . . strongly suggest[] a legislative intent that the

---

[39]  The third statute mentioned in the Sponsor's Statements, N.J.S.A. 54:5-53.1, remains in place and allows municipalities that purchase real property at a tax sale to take possession of the property and "all rents and profits thereof."

selection of any particular statutory remedy should <u>remain within the sound discretion</u> of the municipal or other authorities." (Emphasis added).

Despite the seemingly mandatory language of a portion of N.J.S.A. 2A:42-117, the Sponsor's Statements indicate that the Act was intended to give broad discretion to trial judges. In addition, the laws that were replaced did not mandate appointment of a receiver.

There is nothing in the legislative history of the Act that suggests an intent by the Legislature to <u>require</u> appointment of a receiver if certain conditions were met. Moreover, it makes eminent sense that trial judges should be given discretion to determine <u>if</u> the appointment of a receiver would best serve the interests of tenants and other interested parties. In sum, given the contradictory language contained within the statute, the legislative history favors reading N.J.S.A. 2A:42-117 as permissive rather than mandatory.

<u>The Trial Court's Discretionary Denial of A Receiver</u>

Accordingly, our standard of review here is whether the trial court abused its discretion in denying a receiver. "Under this standard, 'an appellate court should not substitute its own judgment for that of the trial court, unless the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" <u>Hanisko</u>, 437 N.J. Super. at 362 (quoting <u>Brown</u>, 170 N.J. at 147).

We are satisfied the trial court did not abuse its discretion by denying the Litigating Tenants' receivership application. MTTC presented evidence that the cost to rehabilitate the building is estimated to be over $11 million. At the time of trial, only fifty to sixty of the 142 units were occupied, and Cocoziello estimated an attrition rate of ten units per year. The trial court's determination that receivership was not a financially viable solution is supported by the record. Moreover, the decision did not result in a manifest denial of justice because, under the Restructuring Plan, the remaining tenants will be permitted to stay in the rehabilitated building under their current rent restrictions.

The State, the City and the Litigating Tenants fault the trial court for not making a specific finding that the Restructuring Plan was "reasonable." However, given the complexity of the proposed plan, the required financing, and the necessary repairs, the trial court fairly determined that "extraordinary circumstances" existed to warrant the referral to a Special Master, who is tasked with ensuring that the plan, as implemented, is reasonable. R. 4:41-1.

For these multiple reasons, the trial court's decision denying the appointment of a receiver and appointing the Special Master is affirmed.

VI.

We discern no need in this opinion to consider or rely upon the

supplemental materials tendered by PAC Capital from another trial court litigation in Docket No. CPM-L-357-15, which concerns the City's overall affordable housing obligations. The City's affordable housing obligations as a municipality simply are not before us for resolution in this appeal.

The balance of appellants' arguments lack sufficient merit to warrant discussion in this written opinion. R. 2:11-3(e)(1)(E).

VII.

We close this lengthy and very technical opinion with a few generic observations. As the trial court recognized, this project was conceived with laudable objectives to provide housing for needy senior citizens. Unfortunately, the impact of two hurricanes, market declines, and other setbacks caused the project to become fiscally distressed, and publicly issued bonds were unpaid. Sadly, the building has needed major repairs and is now about two-thirds vacant. No alternative developer has stepped forward to rescue the project. The project has been mired in litigation for many years, in part because transactional documents were not drafted with sufficient clarity. No matter what course of action is pursued, the developer's company still owns the land on which the project is built.

The trial court admirably attempted through marathon settlement

conferences to forge a solution. The Restructuring Plan it ultimately approved was the best option presented to it, and is consistent with both the law and the findings based on the extensive trial record.

Although that Plan does not assure the level of affordable units originally intended, it has the upside potential to keep the project viable and avoid its closure and the eviction of the remaining tenants. It is our fervent hope that the litigation and controversy will subside, and that the Plan, or some other variant approved in the Chancery Court, will succeed.

## VIII.

For the foregoing reasons, the trial court's decision is affirmed in part and reversed and remanded in part, with the following instructions:

1. We affirm paragraph 4 of the trial court's May 22, 2018 order abrogating all occupancy and rent restrictions imposed by the HMFA Deed, the amendment to the HMFA Deed, the DCA Deed, the AHA and the DCA Mortgage, upon the entry of a final judgment of foreclosure.

2. We affirm paragraph 12, dismissing the receivership action.

3. We reverse and remand as to paragraph 1, concerning the approval of the Restructuring Plan, in order for the court to make findings as to whether the obligations under the ECIA Loan could be satisfied if the project remains a

"qualified residential rental project" pursuant to 26 U.S.C. § 142(d)(1), and, if so, whether the Restructuring Plan meets that requirement. The trial court also shall make a necessary finding as to whether MBT III is a "qualified housing sponsor" under N.J.S.A. 40:37A-107(j).

4. We reverse and remand as to paragraph 5 for the trial court to resolve the conflict between the proposed Deed Restriction and the Restructuring Plan.

5. We reverse and remand for the trial court to reconsider paragraphs 6, 8, 9, and 10, in light of its findings on remand regarding approval of the Restructuring Plan.

6. We affirm paragraph 3, appointing a Special Master, in the event that the court again approves the Restructuring Plan on remand.

7. We affirm paragraph 7, establishing the priority of existing mortgage liens.[40]

Within forty-five days, the trial court shall issue a final judgment of foreclosure, consistent with our opinion and subject to any supplementary

---

[40] We have no need to address paragraph 2 of the order, which states "Upon entry of a final order of foreclosure and Sheriff's sale, the Trustee, PAC Capital or each's designee is authorized to do all further things and take all actions necessary." We also have no need at this time to address paragraph 11 of the trial court's order, which concerns the hypothetical event of what should occur if the Restructuring Plan is not implemented, an issue that the parties did not brief on appeal.

decisions it may render.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION